UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

RUBEN VAHOS,                                         MEMORANDUM
                                                     AND ORDER
                    Plaintiff,
                                                     06-CV-6783 (NGG) (SMG)
     -against-

GENERAL MOTORS CORPORATION,

                    Defendant.

----------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

In this employment discrimination case, Plaintiff Ruben Vahos, formerly a senior real estate negotiator for defendant General Motors Corporation ("GM"), alleges that he was discharged because of his race and national origin in violation of federal and state law. GM has moved for summary judgment, contending that it discharged Vahos because he violated its "Winning With Integrity" policy by soliciting gifts from dealerships. In opposition to GM's motion, Vahos argues that he did not violate GM's policy; he also asserts that the GM employee who initiated the investigation that resulted in his discharge made a comment to him that reflected discriminatory animus. Because a rational trier of fact could not find that GM unlawfully discriminated against Vahos, GM's motion for summary judgment is GRANTED.

**I.    Standard of Review**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See Fed. R. Civ. P. 56(c);

1

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## II.     Factual Background

Vahos is a Hispanic male born in Colombia. He was employed from June 1998 through September 2005 as a senior real estate negotiator in GM's World Wide Real Estate Group. (Declaration of Saul D. Zabell ("Zabell Decl.") (Docket Entry # 24) Exh. J (Affidavit of Ruben Vahos) ¶¶ 2, 4, 5, 15.)

### A.     GM's "Winning With Integrity" Policy

GM's Winning With Integrity policy ("the Policy") states in part that:

> As a rule, accept no gift, entertainment, or other gratuity from any supplier to GM or bidder for GM's business, including supplier units that are part of GM. This applies to all employees, not just to those involved in purchasing. . . .
>
> Generally, it is best to decline any gift, entertainment, meal, or other gratuity from a supplier and to discuss with your leadership how best to handle questionable situations. GM's goal is to avoid even the appearance of impropriety. Our procurement processes must actually be — and must appear to be — based solely on the price, quality and service of our suppliers. In the final analysis, your good judgment and disclosure are the keys to protecting GM's reputation as a company that conducts business with integrity.

(Declaration of David C. Vogel in Support of the Motion for Summary Judgment of Defendant General Motors Corporation ("Vogel Decl.") (Docket Entry # 30) Exh. A (Deposition of Ruben Vahos ("Vahos Dep.")) Exh. 5.)

2

### B. Ron Redfern's Statement

Ron Redfern, the individual who initiated GM's investigation of Vahos for violations of the Policy, is a Portfolio Manager in GM's Motors Holding Group. He is responsible for four New York dealerships that GM owns and is planning to sell — Bay Chevrolet, New Rochelle Chevrolet, Buick-Pontiac-GMC of Saratoga Springs, and Pontiac-GMC of Latham. Redfern prepared a statement that explains how he came to investigate Vahos. This statement is part of the investigatory report[1] that was submitted to the GM official who made the ultimate decision to fire Vahos — Jay Malott, the director of GM's Retail Real Estate Division. (Vogel Decl. Exh. H (Deposition of Jay Malott ("Malott Dep.")) at 21-22, 25; Zabell Decl. Exh. D-8 (Investigatory Report ("Inv. Rep."))).

According to Redfern's statement, in mid-July 2005 Fran DeRop, the office manager of Bay Chevrolet, told Redfern that Vahos had borrowed a vehicle overnight. DeRop told Redfern that she did not think this was appropriate. DeRop also told Redfern that James Chao, then the interim manager of Bay Chevrolet, was probably the one who gave Vahos permission to borrow the vehicle. Later that month, on July 27, 2005, Woody Woodward, the interim manager of Buick-Pontiac-GMC of Saratoga Springs and Pontiac-GMC of Latham, told Redfern that two years earlier Vahos tried to talk Woodward into loaning him a car to drive. Redfern informed his manager, Mike Mozingo, of what he had learned. Mozingo and Redfern decided that Redfern would follow up with DeRop to get additional details and that Redfern would also contact New Rochelle Chevrolet, the dealership closest to Vahos's office, to see if Vahos had ever borrowed any vehicles there.

---

[1] The admissibility of this investigatory report is discussed below.

DeRop advised Redfern that Vahos came to Bay Chevrolet with his sister[2] and that they took a Corvette on a two-hour test-drive. DeRop told Redfern that Vahos asked the dealership's sales manager for a car to get his sister home; Vahos took a used Chevrolet Impala and returned it two days later.

Peggy Morgan, the office manager of New Rochelle Chevrolet, told Redfern that in 1998 Vahos had taken a vehicle from the previous owner of New Rochelle Chevrolet, Albert "Bucky" Kulinski. Morgan stated that Kulinski let Vahos borrow the vehicle because he hoped that he would then get a better deal on his dealership, which he was in the process of selling to GM. Morgan told Redfern that Kulinski was very upset when Vahos returned the car because it was in horrible condition. (Inv. Rep. at GM0049-GM0050.)

### C. GM's Investigatory Report

GM's investigatory report states that after undertaking this preliminary investigation, Mozingo and Redfern brought their findings to the attention of Kim Howe, a manager in GM's Human Resources department. Howe referred the matter to a Human Resources representative, who requested the assistance of GM Audit Services Special Investigations. (Id. at GM0047.) GM investigators then conducted several interviews in order to substantiate the allegations of misconduct by Vahos.

John Negri, sales manager of Bay Chevrolet, told the investigators that Vahos and his sister visited Bay Chevrolet to test-drive a Corvette. When they returned from the test-drive, Vahos told Negri that his sister was going to need a vehicle and that Vahos would return it the

---

[2] As mentioned below, Vahos later revealed that he came to Bay Chevrolet with his sister-in-law, not his sister.

next day. Chao, the interim manager, told Negri to give Vahos's sister a car. Negri gave Vahos's sister a silver Impala, which she returned five or six days later. (Id. at GM0053.)

DeRop repeated to the investigators what she had earlier told Redfern, that in June, Vahos arrived with his sister at Bay Chevrolet, test-drove a Corvette, and then took a used Impala home for a couple of days. DeRop also told the investigators that the dealership did not have a practice of lending cars to customers. (Id. at GM0052.)

Morgan told the investigators that in 1998, when New Rochelle Chevrolet was still owned by Kulinski, Kulinski told Morgan that Vahos needed a minivan because he was going on a vacation. A new Chevrolet Venture minivan was provided to Vahos. (Id. at GM0055.)

John Bauckham, sales manager of New Rochelle Chevrolet, told the investigators that Kulinski told him that Vahos had said that Kulinski would get a better deal on the sale of his dealership if he loaned Vahos a minivan. Bauckham also stated that on at least two or three occasions in 2000 and 2001, Chris Roberts, the interim manager, directed him to loan Vahos a Chevrolet Avalanche or Tahoe. Vahos kept the vehicles for a week to ten days. (Id. at GM0051.)

When GM's investigators interviewed Vahos, Vahos told them that it was his sister-in-law, not his sister, who had test-driven a Corvette with him at Bay Chevrolet. Vahos told the investigators that his sister-in-law needed to go home and was going to take a cab, but Chao offered her the use of a dealership car to get home. Vahos's sister-in-law took home a 2003 Bonneville and returned it four days later.

Vahos also told the investigators that he borrowed a minivan from Kulinski in 1998, because he had family members in from out of town and he needed a large vehicle to carry them

5

around. Vahos also said that he borrowed a vehicle from Roberts two or three times. According to the investigators, Vahos said that "he made a mistake and wished he hadn't done it." (Id. at GM0057-GM0058.)

    **D.**    **Deposition of Jay Malott**

After this investigation, GM's Human Resources department advised Malott that Vahos had violated the Policy and that he should be discharged. Malott reviewed the investigatory report and discharged Vahos: "And I said at that point in time that if they were sure that he should be terminated, then he should be terminated." (Malott Dep. at 21-23.)

    **E.**    **Vahos's Evidence of Discrimination**

Vahos has presented evidence of discriminatory comments made by GM employees as follows:

1) In June 1998, Peter Prestoy, a GM employee, referred to Vahos as a "piece of shit spic." (Vahos Dep. at 59.)

2) On or about November 30, 2004, Redfern told Vahos to watch his back because Redfern did not like "the foreign sound of [his] name." (Id. at 57.)

3) Late in 2004, Jim Carlisle, an employee who "felt he had been demoted," pulled Vahos aside and warned Vahos that he "was next" because of the color of his skin. (Id. at 40.)

4) GM employees often made derogatory comments about minority dealers. For example, at one time in 2004, Vahos was at a meeting with six or seven people. Three African-American attendees sat next to one another. When Vahos left the meeting, Mike Lobianco told Vahos "Did you notice how the monkeys sat together?" (Id. at 123.)

**III.  Admissibility of GM's Investigatory Report**

Vahos argues that the entire investigatory report prepared by GM, including Redfern's statement, is hearsay and therefore inadmissible.  (Plaintiff's Memorandum of Law Submitted in Opposition to Defendant's Motion for Summary Judgment ("Pl. Mem.") (Docket Entry # 23) at 3.)  Evidence submitted in support of a summary judgment motion must be admissible, and the proponent of the evidence bears the burden of showing that the evidence is admissible.  See Patterson v. County of Oneida, 375 F.3d 206, 219-220, 222 (2d Cir. 2004) (proponent needed to submit affidavit stating that prior testimony he proffered would be admissible under Fed. R. Evid. 804(b)(1)).

Generally, an investigatory report like that prepared by GM would be hearsay unless it qualified as a business record under Fed. R. Evid. 803(6).  GM, however, argues that the investigatory report is not hearsay because it is not "offered in evidence to prove the truth of the matter asserted."  (Reply Memorandum of Law of Defendant General Motors Corporation in Support of its Motion for Summary Judgment ("Def. Rep.") (Docket Entry # 31) at 3); see Fed. R. Evid. 801(c) (definition of hearsay).  GM argues that it is seeking to admit the investigatory report not to prove that Vahos actually acted improperly, but to prove that the GM decision-makers who were involved in discharging Vahos legitimately believed that he had so acted.  This is a legitimate non-hearsay purpose.  In Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 65 (2d Cir. 2003), for example, the Second Circuit found that statements made to an employer about an employee's abusive behavior towards colleagues were not hearsay when admitted to establish whether or not the employer thought the employee was disabled within the meaning of ADA.  Similarly here, since GM seeks to admit the investigatory report only to show

7

that its decision-makers legitimately believed Vahos had acted improperly, the report is admissible for that purpose.[3]

## III. Vahos's Termination Claims

Vahos argues that he was discharged on the basis of his race and national origin and that GM's claim that he violated the Policy is merely a pretext for discrimination.

The court's review of Vahos's discharge claims under Title VII follows the McDonnell Douglas burden-shifting inquiry.[4] See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that test, Vahos must first establish a *prima facie* case of discrimination by demonstrating that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he

---

[3] GM argues in the alternative that the investigatory report is a business record and therefore admissible pursuant to Fed. R. Evid. 803(6). The court agrees with Vahos that GM has not laid a sufficient basis for the report to be admissible as a business record. To be admissible as a business record, a document must first be shown by the testimony or certification of the document's custodian, or of another qualified witness, to be a record "kept in the course of a regularly conducted business activity." Fed. R. Evid. 803(6). Malott, who certified the report as a document "compiled and kept in the course of GM's regularly conducted business activity," does not appear to be "sufficiently familiar with the business practice" of GM in preparing the report so as to render him competent to certify the report as a business record. (Declaration of Jay Malott in Support of the Motion for Summary Judgment of Defendant General Motors Corporation (Docket Entry # 32) ¶ 3); see Phoenix Assocs. III v. Stone, 60 F.3d 95, 101 (2d Cir. 1995). In fact, GM has presented no evidence that, as director of GM's Retail Real Estate Division, Malott is familiar with the record-keeping practices of GM's Human Resources department, which prepared the report. (Malott Dep. at 21-22.) The report is therefore not admissible as a business record under Fed. R. Evid. 803(6). See also 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8.80 (3rd ed. 2007) (investigatory reports "are usually prepared with an awareness that disputes or litigation may come into the picture . . . and many people who provide information to company investigators are doing anything but acting in ordinary course.").

[4] The standards applied to claims brought under the New York State human rights law parallel those applied to Title VII claims. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000). Vahos's New York State human rights law claim for wrongful discharge will therefore not be considered separately from his Title VII claim.

8

was discharged; and (4) his discharge occurred under circumstances giving rise to an inference of discrimination. Cruz v. Coach Stores, Inc., 202 F.3d 560, 567 (2d Cir. 2000). If Vahos establishes a *prima facie* case, the burden shifts to GM to produce a legitimate, non-discriminatory reason for his discharge. If GM satisfies this burden, the burden of production shifts back to Vahos to demonstrate that GM's stated reason is in fact a pretext for discrimination. Id. It is not enough for Vahos merely to create doubt that GM's stated reason was the real reason for discharging him. He must also put forth "evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination" on the basis of his race or national origin. Grady v. Affiliated Cent., Inc., 130 F.3d 553, 561 (2d Cir. 1997). Vahos can meet this burden in either of two different ways: "directly, by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence." Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1185 (2d Cir. 1992) (internal quotation marks and citations omitted). Upon a motion for summary judgment, the court must examine "the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (citation and internal quotation marks omitted).

  A.  **Vahos's *Prima Facie* Case**

GM concedes that Vahos was discharged and that, being Hispanic and of Colombian national origin, Vahos is a member of a protected class. (Memorandum of Law in Support of Defendant GM's Motion for Summary Judgment (Docket Entry # 29) at 10, 14.) For the

9

purposes of its motion, moreover, GM concedes that Vahos was qualified for the position that he held. (Id. at 11.) GM, however, claims that Vahos has not presented sufficient evidence for a rational trier of fact to conclude that Vahos was discharged under circumstances giving rise to an inference of discrimination. (Id.)

Because the evidence relevant to establishing Vahos's *prima facie* case is the same as that Vahos would use to meet his ultimate burden of showing intentional discrimination, the court will assume *arguendo* that Vahos has presented sufficient evidence to give rise to an inference of discrimination. See Bickerstaff v. Vassar College, 196 F.3d 435, 447 (2d Cir. 1999) (assuming that plaintiff has made out a *prima facie* case).[5]

---

[5] Vahos also asks the court to analyze his claim using the "mixed motives" analysis of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). (Pl. Mem. at 12.) In a "mixed motives" case, the plaintiff can satisfy his entire burden of proof by initially producing evidence sufficient to demonstrate that discrimination was "*in fact* a 'motivating' or 'substantial' factor in the employment decision." de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs., 82 F.3d 16, 23 (2d Cir. 1996). The only evidence sufficient to satisfy this burden is evidence that "directly reflects" a discriminatory motivation, like "policy documents and evidence of statements of actions by decisionmakers" that constitute a "smoking gun" or, at the very least, a "thick cloud of smoke." Raskin v. Wyatt Co., 125 F.3d 55, 60-61 (2d Cir. 1997). Once the plaintiff presents such evidence, the burden of proof shifts to the defendant to prove that it "would have made the same decision absent the discriminatory factor." Id. at 60.

The Second Circuit has stated that the plaintiff's ultimate burden under McDonnell Douglas, when the plaintiff proceeds by introducing direct evidence of a discriminatory motivation, is the same as the plaintiff's initial burden under Price Waterhouse. Tyler, 958 F.2d at 1185. The difference between the two is simply that

> under Price Waterhouse, the plaintiff begins by focusing on the alleged discrimination itself, while the [McDonnell Douglas] plaintiff starts by focusing on his own qualifications and the employer's needs.

Id. As there is no difference between the plaintiff's initial burden under Price Waterhouse and the plaintiff's ultimate burden under McDonnell Douglas, and because the court will now determine whether Vahos has met his ultimate burden under McDonnell Douglas, the court will not separately analyze his claims under Price Waterhouse.

10

### B. GM's Legitimate Reason for Discharging Vahos

GM has satisfied its burden of proffering admissible evidence of a legitimate, nondiscriminatory reason for terminating Vahos — namely, that its decision-makers believed that he violated the Policy. The Policy states that "it is best to decline any gift . . . or other gratuity from a supplier" and states that "GM's goal is to avoid even the appearance of impropriety." (Vahos Dep. Exh. 5.) The Policy specifically states that it applies to "any supplier to GM or bidder for GM's business" and to "all employees, not just those involved in purchasing." (Id.) Malott and GM's Human Resources department could legitimately have believed that borrowing cars from dealerships for multiple days was a clear violation of this policy. In any case, they legitimately could have believed that Vahos's actions created "the appearance of impropriety." In fact, Bauckham's statement to GM's investigators that Vahos told Kulinski that Kulinski would get a better deal on the sale of his dealership if he loaned Vahos a minivan, if believed by GM's decision-makers, would be a sufficient basis to discharge Vahos, showing as it does that Vahos was putting his own interests ahead of GM's. (See Inv. Rep. at GM0051.)

### C. Vahos's Ultimate Burden

To meet his ultimate burden, Vahos must present "sufficient admissible evidence from which a rational finder of fact could infer that more likely than not [he] was the victim of intentional discrimination." Bickerstaff, 196 F.3d at 447. As stated above, Vahos can meet this burden either "directly, by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proferred explanation is unworthy of credence." Tyler, 958 F.2d at 1185.

As proof that his discharge was motivated by discrimination, Vahos points to the

11

discriminatory comments made by his co-workers and especially to Redfern's statement to Vahos in November 2004 that Vahos should watch his back because Redfern did not like "the foreign sound of [his] name." (Pl. Mem. at 16.) Generally, "the more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative [of unlawful discrimination] that remark will be." Tomassi v. Insignia Fin'l Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007). Moreover, "impermissible bias of a single individual . . . may taint the ultimate employment decision . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process." Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 125-26 (2d Cir. 2004), quoting Bickerstaff, 196 F.3d at 450. Therefore, in certain circumstances, a discriminatory remark might be probative of an employer's discriminatory motivation even if made by a person, like Redfern, who did not make the allegedly unlawful employment decision. In Back, for example, discriminatory remarks made by supervisors who themselves did not make any employment decision were probative of discrimination when those supervisors wrote negative performance evaluations upon which the ultimate decision-maker heavily relied. Back, 365 F.3d at 126. On the other hand, a student who sat on a committee which issued a negative evaluation of a professor's teaching ability did not play a "meaningful role" in a university's decision to deny the professor a promotion where the committee's role in the promotion process was limited and its conclusions were echoed by other committees and individuals with input into the process. Any discriminatory remarks allegedly made by that student were held not to be probative of a discrimination. Bickerstaff, 196 F.3d at 451.

The court finds that this situation is more similar to that in Bickerstaff than to that in Back. Although Redfern initiated the investigation of Vahos and interviewed several of the people whose accusations eventually led to Vahos's termination, GM's investigators independently corroborated everything in Redfern's statement. See id. ("In varying degrees, at least five levels of Vassar decision makers expressed the same concern over Bickerstaff's student evaluations"). Absent evidence that Redfern played a more significant role in Vahos's termination – for example, by importuning other GM employees to make false accusations against Vahos, or by exaggerating Vahos's misconduct – the court finds that his statements are only of limited probative value in helping Vahos meet his ultimate burden of showing his discharge was unlawful.[6]

Vahos also argues that he never violated the Policy. What is most relevant here is whether GM legitimately thought that Vahos had violated the Policy, and not whether Vahos actually violated the Policy. See McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006). However, evidence that Vahos did not actually violate the Policy might tend to show that GM did not legitimately think he had violated the Policy; more generally, a showing of "bizarre or duplicitous processes might strengthen a plaintiff's showing of pretext." Id. at 216 n.7. Vahos has presented no evidence that GM's investigation was conducted contrary to normal procedures, or that he was treated differently from other GM employees accused of similar misconduct. See Shumway v. United Parcel Serv., 118 F.3d 60, 64 (2d Cir. 1997) (disparate

---

[6] As they are even more obliquely related to the adverse employment action at issue here than Redfern's comment, the other comments cited by Vahos, and his deposition testimony that he was excluded from meetings and otherwise treated unfairly at GM (see Pl. Mem. at 16-18), are similarly of limited probative value.

discipline for misconduct is probative of discrimination). Moreover, Vahos's attempts to argue that GM was acting in a biased or arbitrary fashion when it determined that he had violated the Policy are unavailing. GM legitimately concluded that Vahos did more than just "test-drive" cars: it had evidence that he borrowed cars from dealerships for multiple days, after telling at least one dealer that he would give the dealer a good deal when negotiating with him on GM's behalf. The Policy counseled against the "appearance of impropriety," and Malott and GM's Human Resources department reasonably determined that Vahos's conduct clearly created such an appearance.[7] Predicated on this evidence, Malott legitimately discharged Vahos for creating an "appearance of impropriety" even though he could not point to any particular instance in which Vahos's conflicts of interest had actually had a tangible negative impact on GM's bottom line. (See Malott Dep. at 100.)

  As he has failed to present evidence that GM's reason for discharging him is pretextual or that other GM employees were not similarly disciplined for similar misconduct, Vahos has failed to present circumstantial evidence of discrimination sufficient to meet his burden under McDonnell Douglas. As he has similarly failed to present sufficient direct evidence of discrimination, see supra at 13, Vahos has failed to meet his ultimate burden to present evidence from which a rational factfinder might conclude that GM was motivated by discrimination when

---

[7] Vahos testified at his deposition that he was systematically excluded by his co-workers from meetings and deals at GM and scapegoated for others' poor performance, so as to affect his "performance evaluations and standing within the company." (See Pl. Mem. at 18; Vahos Dep. at 35-39.) Vahos, however, has not presented any evidence that GM discharged him for poor performance or that Malott or GM's Human Resources department considered his performance evaluations when they determined that he should be discharged. Vahos's evidence of unfair treatment by his co-workers therefore does not tend to prove that GM's stated reason for discharging him was pretextual.

it discharged him.

**IV. CONCLUSION**

    For the reasons set forth above, the court GRANTS GM's motion for summary judgment.

The clerk of court is directed to close the case and enter judgment for the defendant.

SO ORDERED.

Dated: June 16, 2008                                                          /s Nicholas G. Garaufis
      Brooklyn, N.Y.                                                      NICHOLAS G. GARAUFIS
                                                                               United States District Judge